UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22-60110-CR-SINGHAL

UNITED STATES OF AMERICA

vs.

ALEXANDER BLAISE and
DUMARSAIS BLAISE JR.,

      Defendants.
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned counsel, hereby submits this Sentencing Memorandum as to Defendants Alexander Blaise ("A. Blaise") and Dumarsais Blaise ("D. Blaise") (together the "Defendants"). The Defendants are scheduled for sentencing on April 10, 2023 for their respective convictions by guilty plea to one count of conspiracy to commit wire fraud, in violation of Title 18, United State Code, Sections 1349. The offense stems from the Defendants' role in applying for and obtaining $1,609,628 in fraudulent Paycheck Protection Program ("PPP") loans.

For the reasons set forth below, the United States respectfully recommends that the Court sentence the Defendants to terms of imprisonment within the applicable Sentencing Guidelines ranges. The United States further requests that these terms each be followed by three years of supervised release.[1] The sentences recommended by the United States will provide punishment that is sufficient, but not greater than necessary, to accomplish the purposes of sentencing set forth

---

[1] The United States is also seeking restitution of $1,609,628 consistent with the Plea Agreements [ECF Nos. 45 ¶15 and 49 ¶15]. The Defendants have also agreed to pay special assessments of $100 [ECF Nos. 45 ¶ 5 and 49 ¶ 5].

in 18 U.S.C. § 3553(a).

**I.     BACKGROUND**

    **A.     The CARES Act**

In March 2020, in response to the many challenges presented by the pandemic, Congress passed the CARES ACT, Pub. L. 116-136, which created the Paycheck Protection Program ("PPP"). The PPP authorized $349 billion in forgivable loans to small businesses to be used for payroll, mortgage interest, rent/lease payments, or utilities. In April 2020, Congress authorized an additional $310 billion for PPP funding. These funds were designed to address the unprecedented crisis facing Americans—especially business owners and their employees, whose livelihoods were threatened by the public health emergency. PPP funds were designed as a lifeline.

The program was designed to provide funds quickly and easily to qualifying individuals. PPP loans were distributed by banks who had existing relationships with many of the applicants. To apply, individuals submitted an application to a participating financial institution along with supporting documentation as to the business's payroll expenses. The supporting documentation requirement was minimal and could be satisfied with one years' worth of the company's tax records. If a PPP loan application was approved, the participating financial institution funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA").

    **B.     Overview of the Defendants' Conduct**

A more detailed recitation of the facts relating to the scheme are detailed in the Indictment [ECF No. 1], the Defendants' factual proffer statements [ECF Nos. 46 and 50], and the final Presentence Investigation Reports disclosed by the United States Probation Office ("Probation") on April 3, 2023 [ECF Nos. 58 and 59] (the "PSRs").

Beginning in and around April 2020 through in or around at least August 2020, the Defendants conspired to submit three false and fraudulent PPP loan applications for three sham companies: One of One LLC ("One of One"), Appetite for Everything Inc. ("Appetite"), and Acute Care Coordinating Systems PA ("ACCS"). In total, as part of the conspiracy, the Defendants fraudulently obtained $1,609,628, which is the loss figure Probation properly applied in the PSRs.

In and around April 2020, D. Blaise and Anthony Wallace ("Wallace") discussed the requirements of the PPP program. Around the same time, the Defendants agreed to help Wallace submit PPP loan applications, which all three contemplated would contain false statements and would be supported by false documentation. As part of the agreement, the Defendants would receive a portion of any PPP loan proceeds that Wallace received through the scheme.

On or about May 4, 2020, D. Blaise sent copies of a fake 2019 IRS Form W3 for ACCS to A. Blaise. Also, on or about May 4, 2020, A. Blaise sent copies of several fake 2019 IRS Form W3s to Wallace via email. The forms were sent as part of the conspiracy in anticipation of submitting false PPP loan applications. The document properties, metadata, associated with the IRS Form W3 that A. Blaise received from D. Blaise for ACCS showed that D. Blaise created and revised the form on or about May 4, 2020.

On or about May 8, 2020, the Defendants assisted Wallace in submitting an electronic PPP loan application requesting approximately $626,367 for One of One. On or about May 9, 2020, the Defendants also assisted Wallace in submitting an electronic PPP loan application requesting $626,776 for Appetite. On or about May 11, 2020, the Defendants submitted an electronic PPP loan application requesting $356,485 for ACCS. Two of these three PPP loan applications—for ACCS and Appetite—included the fake IRS Form W3s the conspirators exchanged via email on

3

May 4, 2020.[2] All three loan applications contained a number of false statements and supporting tax documents that were never filed with the IRS. Further, none of the three companies reported any employees or revenue to the Florida Department of Revenue as required by law. Nonetheless, the three PPP loan applications for One of One, Appetite, and ACCS induced lenders to deposit PPP loan proceeds into bank accounts controlled by Wallace, Wallace, and A. Blaise, respectively.

Bank records showed that between on or about May 19, 2020, and on or about July 16, 2020, both A. Blaise and Wallace transferred the majority of the proceeds of these three PPP loans to a bank account D. Blaise controlled in the name of his company, D&C Tax City. Specifically, A. Blaise transferred approximately $270,000 and Wallace transferred approximately $900,000. D. Blaise then caused some of these funds to be transmitted back to A. Blaise and Wallace, sometimes to accounts held jointly between A. Blaise and others, while retaining a portion of the funds for himself.

The conspirators then engaged in a scheme to obscure the nature of these payments D. Blaise made back to A. Blaise and Wallace. On or about August 11, 2020, D. Blaise emailed Wallace a fake "Employee Payment Summary Report" purporting to list "employees" and pay for One of One associated with the May 8, 2020 PPP loan application. The Defendants were listed as employees on this report, despite having never been employed by One of One. On or about August 28, 2020, Wallace received a fake "Employee Payment Summary Report" for Appetite associated with the May 9, 2020 PPP loan application, from an email account associated with D&C Tax City. The sender copied D. Blaise's personal email address.   The Defendants were listed as employees

---

[2] A fourth unfunded PPP loan application for One for One included a fake IRS Form W3 that A. Blaise emailed to Wallace on May 4, 2020.

4

on this report, despite having never been employed by Appetite.

Similarly, on or about May 21, 2020, D. Blaise emailed A. Blaise a fake "Employee Payment Summary Report" purporting to list "employees" and pay for ACCS associated with the May 11, 2020 PPP loan application,. The Defendants were listed as employees on this report. On or about August 11, 2020, A. Blaise received another fake "Employee Payment Summary Report" for ACCS from D. Blaise's personal email address.  D. Blaise and A. Blaise were listed as employees on this report as well. Neither D. Blaise nor A. Blaise ever worked for ACCS, which, as noted, conducted no substantive business.

## II.   PROCEDURAL HISTORY

On May 19, 2022, the Defendants were charged by Indictment with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1349 (Count One), wire fraud, in violation of Title 18, United States Code, Sections 1343 (Counts Two through Four), conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h)(Count Five), money laundering, in violation of Title 18, United States Code, Section 1957 (Count 6), and money laundering in violation of United States Code, Section 1956(a)(1)(B)(i) (Counts Seven through Ten). [ECF No. 1]. The Defendants each pleaded guilty to Count One of the Indictment pursuant to written plea agreements on January 4, 2023. [ECF Nos. 44 and 48].  Sentencing is scheduled for April 10, 2023.

## III.   SENTENCING GUIDELINES CALCULATIONS

As explained below, the United States submits that A. Blaise's Total Offense Level is 22 and D. Blaise's Total Offense Level is 24.  At Criminal History Category I, this produces the respective advisory Guidelines range of 41-51 months of imprisonment for A. Blaise and 51-63

months of imprisonment for D. Blaise.

### A. The PSR Correctly Computes the Offense Level

As set forth in the PSR, Probation computes the Total Offense Level for A. Blaise at 22 [ECF No. 58 ¶¶ 46-53] and for D. Blaise at 24 [ECF No. 59 ¶¶ 47-55]. The United States concurs with the Offense Level computation in the PSR, which is as follows:

**A. Blaise:**

| | |
|---|---:|
| Base Offense Level, § 2B1.1(a)(1) | 7 |
| Loss greater than $1,500,000 but less than $3,500,000, § 2B1.1(b)(1)(I) | 16 |
| Sophisticated Means, § 2B1.1(b)(10) | 2 |
| Acceptance of Responsibility and Timely Notification § 3E1.1(a) and (b) | (3) |
| **Total Offense Level** | **22** |

**D. Blaise:**

| | |
|---|---:|
| Base Offense Level, § 2B1.1(a)(1) | 7 |
| Loss greater than $1,500,000 but less than $3,500,000, § 2B1.1(b)(1)(I) | 16 |
| Organizer/Leader, § 3B1.1(c) | 2 |
| Sophisticated Means, § 2B1.1(b)(10) | 2 |
| Acceptance of Responsibility and Timely Notification § 3E1.1(a) and (b) | (3) |
| **Total Offense Level** | **24** |

Defendants object to the calculation of the Guidelines in two respects. First, they object to the calculation of the loss amount pursuant to Section 2B1.1(b)(1)(I). Second, they object to the application of the sophisticated means enhancement pursuant to Section 2B1.1(b)(10). Separately,

D. Blaise also objects to the application of the organizer/leader enhancement pursuant to 3B1.1(c). The government disagrees as further explained below.

### B. The Correct Loss Amount is Greater than $1,500,000

The Defendants worked together with Wallace in applying for the three fraudulent PPP loans. The acts of each member of the conspiracy were reasonably foreseeable. Under the circumstances, both Defendants knew that their actions of creating fake tax documents and causing these documents to be submitted with the associated fraudulent applications would likely result in disbursement of PPP proceeds. This knowledge is further buttressed by the systematic laundering, use, and attempt at hiding the source of the funds after the proceeds were disbursed. *See United States v. Huff*, 609 F.3d 1240 (11th Cir. 2010) (affirming district court's decision to use a loss amount including the fraud of co-conspirators in calculating sentencing guidelines). In doing so, the *Huff* court reiterated U.S.S.G. § 1B1.3(a)(1)(A) and (B) in opining that the amount of loss is the greater of the value of payment, the benefit received or to be received in return for the payment, or the loss to the government for the offense. Thus, a defendant convicted for conspiracy to commit wire fraud is liable for (1) all acts by others that he aided and abetted; and (2) the acts of his co-conspirators that were reasonably foreseeable to him and thus, jointly undertaken criminal activity. *See United States v. Rodriguez*, 751 F.3d 1244 (11th Cir. 2014) (affirming that the proper calculation of the loss amount for the guidelines requires consideration of "all relevant conduct," not merely charged conduct). The *Rodriguez* court further explained relevant conduct to include "all acts and omissions…that were part of the same course of conduct or common scheme or plan as the offense of conviction", and a participant in a conspiracy may thus be held "responsible for the losses resulting from the foreseeable acts of the co-conspirators in furtherance of the

7

conspiracy". *Id.*; *see also United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010) (affirming the use of reasonable foreseeable acts of co-conspirators that were in furtherance of the conspiracy in calculating the appropriate loss amount enhancement). Accordingly, the appropriate loss amount here includes the foreseeable acts of A. Blaise, D. Blaise, and Wallace, which resulted in the disbursement of $1,609,628.

### C. The Sophisticated Means Enhancement Applies

The Defendants object to the application of the sophisticated means enhancement, arguing that the enhancement does not apply to their specific set of facts. This argument is misplaced, however, because of the steps that these Defendants took to further the conspiracy which are recognized to merit a sophisticated means enhancement. *See United States v. Robertson*, 493 F.3d 1322, 1332 (11th Cir. 2007) (affirming application of sophisticated means enhancement where the defendant used the names of nonexistent businesses and other people's addresses to circumvent a company's policy of not shipping products to customers whose accounts were more than 30 days in arrears); *United States v. Taylor*, 652 F. App'x 902, 911 (11th Cir. 2016) (affirming enhancement where defendant used fake case citations to sneak identifying information past prison mail screeners and sent it to co-conspirator using the co-conspirator's various aliases). The PPP applications included fabricated information and supporting documents. The Defendants worked together to create and use fake IRS tax documents and fake employee payroll reports in support of their fraudulent PPP applications. Once the funds were received, the Defendants systematically worked together to transfer the funds from the depository account to an account controlled by D. Blaise, who then, with the assistance of A. Blaise, transferred funds back to accounts under the guise of payroll payments. Bank records show that some of the payments were disguised as

payments to employees who did not exist and were never associated the Defendants.

The Defendants took these steps as part of a complex effort to conceal their involvement in the scheme and prevent law enforcement from uncovering the fraud, supporting application of the sophisticated means enhancement. *See United States v. Clum*, 607 F. App'x 922, 930 (11th Cir. 2015) (upholding enhancement where "defendants took substantial steps to conceal their activities, their identities, and their proceeds from their scheme"); *United States v. Williams*, 509 F. App'x 941, 943 (11th Cir. 2013) (affirming district court finding "that 'the totality of the scheme' was sophisticated, considering both Williams's use of multiple aliases, credit cards, email accounts, IP addresses and shipping addresses, and the sophistication required to gain access to victims' accounts"). In short, this was not simply a case in which the Defendants falsely told the banks an incorrect name. The Defendants went far beyond that: they inflated the figures listed on the applications and supporting documents, fabricated the documents associated with the applications, utilized complex financial transactions to hide the source of the funds, and created fake payroll documents to legitimize the fake applications and business.

### D. Organizer/Leader Enhancement Applies for D. Blaise

D. Blaise objects to the application of the Organizer/Leader enhancement, claiming that he was not the mastermind of this conspiracy. However, the enhancement is appropriate because the evidence shows that he was leading and directing the core conduct in the conspiracy. D. Blaise created the fraudulent document provided for the ACCS application and sent it to A. Blaise. When the funds were obtained, consistent with their agreement, A. Blaise and Wallace transferred a majority of the proceeds to an account in which D. Blaise was the sole signatory. From this account, and while keeping a portion of the proceeds for himself, D. Blaise systematically

transferred payments back to A. Blaise and Wallace in order to make the payments appear as payroll. These transfers often included names of individuals not associated with any of the companies as the recipient of the funds, even though the funds were being transferred to accounts of A. Blaise, Wallace, or their assignees. After the funds were transferred, D. Blaise created fake payroll documents and sent them to both A. Blaise and Wallace, listing himself as an employee at all of the associated companies and one of the many recipient of payroll from said companies, all in an attempt to cover up the laundering of the proceeds. These facts support application of the Leader/Organizer enhancement. *See United States v. Mayer*, 679 F. App'x 895 (11th Cir. 2017) (affirming district court findings application of the organizer enhancement based on the defendant's role in signing the false documents); *United States v. Williams*, 527 F.3d 1235 (11th Cir. 2008) (the court opined that an organizer/leader enhancement is appropriate if found by a preponderance of evidence that the defendant was criminally responsible for the wire fraud or federal funds theft and the defendant exerted some degree of control, leadership or influence); *United States v. Holland* 22 F.3d 1040 (11th Cir. 1994) (the court opined that in determining whether to apply a 3B1.1 enhancement, a court is instructed to consider "all acts or omissions 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'"). Consequently, D. Blaise's actions in the wire fraud scheme was not only as a facilitator, by creating the fake employee payroll reports to cover up the illegitimate source of the funds, but also one of leader and organizer by creating the fake documents that were used for the applications and laundering the proceeds after the funds were transferred to his account.

## IV.      CONSIDERATION OF SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Title 18, United States Code, Section 3553(a), enumerates several factors that the Court

shall consider in sentencing a defendant. As addressed in turn below, the 3553(a) factors relevant to the Defendants support the sentence recommended by the United States.

      **A.**      **Nature and Circumstances of the Office**

The Defendants' criminal conduct in this case is serious as they fraudulently sought to obtain pandemic-related loans that were supposed to be emergency and disaster relief to those businesses affected by the COVID-19 pandemic. In 2020, as the COVID-19 pandemic spread across the country causing illness, death and economic distress, the government created PPP loans to help small business owners and their employees whose livelihoods were jeopardized. The COVID-19 pandemic was an extraordinarily serious public health crisis, and it had profound economic ramifications. The Defendants took advantage of the program by facilitating the prolific submission of false applications claiming to have employees and payroll that did not exist. Those applications were supported by false tax forms. The Defendants' exploitation of the crisis not only cost the government, the SBA, and affiliated lenders time and money, but also diverted funds that could have been used the way PPP loans were intended: to assist struggling businesses and to keep people employed. Instead, The Defendants took money that was earmarked for legitimate small businesses and dissipated it for their own personal enrichment.

Furthermore, the Defendants fraud was not an impulsive one-off; they applied for three different loans to which they knew they were not entitled, and knowingly submitted false documents attesting to these fraudulent companies, payroll expenses, tax payments, and other financial information. As such, the Defendants' conduct, which through the diversion of relief money caused direct harm to a vulnerable public, warrants a meaningful custodial sentence.

**B.     Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant**

A significant sentence is also necessary to provide general deterrence. The Defendants' actions warrant commensurately significant consequences, both due to the seriousness of the offense and as a general deterrent to send a message to the broader public that taking advantage of a national emergency to enrich oneself at the public expense will result in serious consequences. Given that criminal conduct like that at issue here is typically more difficult to detect and prosecute than sudden crimes of passion or opportunity, there is a greater need for general deterrence. The Eleventh Circuit has explicitly stated that "general deterrence is an important factor in white-collar cases, where the motivation is greed." *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014). This case was motivated by greed at time when millions of Americans were suffering from the economic impact of a global pandemic. As the pandemic spread, so too did fraud related to the PPP program and other programs designed to provide critical economic assistance, especially in the Southern District of Florida. The government's recommended sentence will send a clear message to the Defendants and other offenders that there are serious consequences for defrauding government pandemic relief programs. The Defendants' sentence will serve as a warning and deterrent to others inclined to exploit pandemic relief programs. *See, e.g., United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

### C. Need for the Sentence to Avoid Unwarranted Sentencing Disparities

The sentence recommended by the United States will not create an unwarranted sentencing disparity. There are two relevant points of comparison to avoid unwarranted sentencing disparities: sentences associated with others convicted of PPP related fraud, and the sentence of Wallace, the co-conspirator in this case. Judges of this Court and of other districts have imposed sentences with significant terms of imprisonment for offenses related to PPP fraud. *See, e.g.*, *United States v. Joselin*, Case No. 22-60028-CR-Dimitrouleas (S.D. Fla. Nov. 2, 2022) (sentencing defendant to 84 months' imprisonment following trial for numerous PPP fraud offenses amounting to about $1.95 million in intended loss); *United States v. Kralievits*, Case No. 21-20157-CR-Altonaga (S.D. Fla. June 30, 2021) (sentencing cooperating defendant to 19-month term of imprisonment (following reduction pursuant to 5K1.1) in connection with two fraudulent PPP loans totaling approximately $824,750); *United States v. Hines*, Case No. 21-20011-CR-Cooke (S.D. Fla. May 12, 2021) (imposing 78-month term of imprisonment for defendant responsible for a loss of $3.9 million resulting from multiple fraudulent PPP loans); *United States v. Tubbs*, 20-00193-CR-Miller (E.D. Ark.) (imposing 41-month term of imprisonment for defendant responsible for loss of $1.9 million resulting from two fraudulent PPP loans).

The co-conspirator in this scheme, Wallace, has a pending sentencing date of May 18, 2023. At that time, the United States will also be requesting a sentence within the applicable Guidelines range.

### V. RESTITUTION AND FORFEITURE

Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A(a)(1). As set forth in

13

the Plea Agreements [ECF Nos. 45 and 49 ¶ 15], it is the government's position that the Defendants owe restitution in the amount of $1,609,628. Restitution is owed joint and severally between the Defendants and Wallace, who was charged in *United States v. Wallace*, 22-CR-60113-AHS. It is well established that forfeiture and restitution are separate and distinct parts of a defendant's sentence that serve different purposes, and that they both are mandatory. As a result, the government could seek forfeiture as well.

## CONCLUSION

For the forgoing reasons, the United States respectfully recommends that the Court sentence the Defendants to terms of imprisonment within the applicable Sentencing Guidelines ranges. The United States further requests the Court to sentence each Defendant to a term of supervised release of three (3) years. The United States also requests that the Court order restitution and a special assessment, consistent with the Plea Agreements [ECF Nos. 45 and 49].

Respectfully Submitted,

| MARKENZY LAPOINTE | GLENN S. LEON |
| --- | --- |
| UNITED STATES ATTORNEY | CHIEF, FRAUD SECTION |

By:  /s/ *Kiran Bhat*　　　　　　　　　　By:  /s/ *Edward E. Emokpae*
　　　KIRAN BHAT　　　　　　　　　　　　　　EDWARD E. EMOKPAE
　　　Assistant United States Attorney　　　　　Trial Attorney, Fraud Section
　　　Fla. Bar NO. 1008370　　　　　　　　　　U.S. Department of Justice
　　　400 North Miami Avenue　　　　　　　　1400 New York Ave NW
　　　Miami, FL 33131　　　　　　　　　　　　Washington, DC 20530
　　　Tel: (305) 961-9103　　　　　　　　　　Tel: (202) 616-2551
　　　Fax: (954) 695-0651　　　　　　　　　　Fax: (202) 514-3708
　　　kiran.bhat@usdoj.gov　　　　　　　　　Edward.Emokpae@usdoj.gov

14

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on April 5, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.

*/s/ Edward E. Emokpae*
Trial Attorney